## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MONTANA

In re

**MOBILEDIRECT, INC.,**

Debtor.

Case No. **16-60596-11**

## MEMORANDUM OF DECISION

At Butte in said District this 24th day of May, 2018.

In this Chapter 11[1] bankruptcy, creditor Arthur Milliken ("Milliken") filed a Motion to

Dismiss or Convert the case to Chapter 7, ("Motion") (ECF No. 127) and Objection to Entry of

Final Decree ("Milliken's Objection") (ECF No. 128), pursuant to Mont. LBR 9013(g)(2)(y).

Milliken contends that the Debtor is not entitled to a final decree because Debtor failed to enter

into any license agreement for the license or sale of some or all of its assets within the

"Marketing Term" defined in the Debtor's confirmed Amended Plan of Liquidation ("Plan")

(ECF No. 65), and the Plan provides for dismissal under those circumstances.

Debtor objected to the Motion, arguing that the Motion is devoid of a legal or factual

basis. ECF No. 133. A hearing was held on February 2, 2018. Debtor's Exhibits 1-24 ("Ex.")

and Milliken's Exhibits AM 1-16 ("Ex. AM") were admitted into evidence by agreement of the

parties. Clyde Neu ("Neu")[2] was the only witness who testified. At the conclusion of the

---

[1] Unless specified otherwise, all statutory references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, all "Rule" references are to the Federal Rules of Bankruptcy Procedure, and all "Civil Rule" references are to the Federal Rules of Civil Procedure.

[2] Pre-Petition Clyde Neu was a Director, Treasurer/Chief Financial Officer, and secretary of Debtor. Ex. 12 at 11. Post-Petition he was Debtor's manager. *Id.*

1

hearing, the Court granted the parties' request to submit additional post-hearing briefs.  The post-hearing briefs filed by Milliken (ECF No. 157, "Milliken Second Brief"), Debtor (ECF No. 158, "Debtor Second Brief") and the United States Trustee (ECF No. 162, "UST Brief") have been filed and reviewed by the Court, together with the record and applicable law.  For the reasons set forth below the Court sustains Milliken's Objection to entry of a Final Decree, vacates the Final Decree, and grants Milliken's Motion to Dismiss under 11 U.S.C. §1112(b)(4)(N) for Debtor's material default with respect to the confirmed Plan.

<u>Facts</u>

### A. Debtor's Disclosure Statement and Plan

Debtor owns intellectual property that it described as, "proprietary computer software that supports a novel, end-to-end interactive multimedia viewing experience for use by content creators and distributors targeting viewer engagement within cinema and video productions." Ex. 11 at 7.  Debtor filed its bankruptcy petition June 13, 2016, following a failed attempt to negotiate the third-extension of a note maturity date.  *Id.* at 6.  The filing of the petition prevented Debtor from executing a "dual effort" plan to license and/or sell the Debtor's assets to liquidate its debts.  *Id.* at 6-7.

In its Amended Disclosure Statement filed February 7, 2017 ("Disclosure Statement"), Debtor explained that payments under the Plan would be funded as follows:

> The payments provide for under the Plan will be paid from the proceeds of licensing or sale of the Debtor's assets, primarily of its intellectual property.

*Id.* at 25.  Debtor further explained that:

> Clyde Neu and its former CEO Dan James will implement marketing plan that targets prospects interested in MobileDirect's proprietary, patentable technology. . . . . . Mobile Direct has identified several <u>large</u> potential licensees, and will seek as many mutually exclusive applications for the technology as possible (i.e., Internet (cloud) platforms/infrastructure; video surveillance and security; e-commerce; media broadcast

and entertainment, telecommunications, education, etc.). The focus of MobileDirect's
marketing efforts will also include <u>one or another of the successful companies that
already are established in e-commerce with "interactive video," and that already have
established customers using interactive video to market products</u>. (emphasis added)

*Id.*

> The Marketing Term was defined as:
>
> . . . . the date of this Plan until a date six months following entry of a Final Order of
> confirmation of Debtor's Chapter 11 Plan. If Debtor enters into a license that generates
> revenue for the Debtor post-confirmation, then the Marketing Term, before or after entry
> of a Final Decree closing of the Debtor's Ch. 11 case, is deemed extended to correspond
> to the expiration of the term of any license, to the expiration of the term of any renewal of
> such license of its assets, and/or to a date necessary to close on any sale of the Debtor's
> assets granted under an option to purchase its assets granted in any license, or otherwise.

*Id.* at 26.  The consequences of failing to enter a license or sell the technology were described as:

> If, at the end of the Marketing Term, Debtor has not entered into any contract to license
> or a contract for sale of patented or unpatented technology or software, or of its registered
> trademarks, then, if no Final Decree has been entered in this case, any party may move to
> dismiss or convert the Debtor's Chapter 11 case . . . . . The Debtor may file a motion for
> entry of a Final Decree any time after confirmation of a Chapter 11 plan and after it has
> entered into any agreement to license or sell any of its intellectual property. If a Final
> Decree has been entered in Debtor's Chapter 11 case, creditors and parties in interest
> shall be limited to their remedies under non bankruptcy law for any breach of
> Mobiledirect's obligations under its confirmed Chapter 11 Plan.

*Id.*  The Disclosure Statement was approved.

The Plan provisions were generally consistent with the Disclosure Statement, and

specifically encouraged individuals to read the Disclosure Statement.  The Plan provided:

> Allowed administrative expenses, the priority tax claim of the U.S. Internal Revenue
> Service, the Allowed Class 1 Secured Claims (to the extent the Claims of holders of Class
> 1 Claims are not Disputed Claims and are not avoided pursuant to the terms of this Plan),
> Allowed Class No. 2 (Unsecured Professional Claims), Class 3 (Allowed General
> Unsecured Claims), and Class 4 (Allowed Equity Interests) shall be paid from the net
> proceeds of licensing and/or sale of Debtor's intellectual property (patented and
> unpatented technology and software, and its registered trademarks).

Ex. 12, § 7.01.1.  Next, the Plan provided that if Debtor "has not entered into any contract to

license or a contract for sale of patented or unpatented technology or software, or of its registered

3

trademarks, then, if no Final Decree has been entered in this case, any party may move to dismiss or convert the Debtor's Chapter 11 case." Ex. 12, § 7.01.2. Finally, under the Plan, "Debtor shall be deemed to have the exclusive right to market and license and/or to sell the assets of the Estate, as the Debtor may elect in accordance with the marketing and sale procedures and requirements set forth in this Article VII of the Plan." Ex. 12, § 7.01.3.

The Plan was confirmed. At the confirmation hearing Neu testified that the technology was novel and unique. He further testified that the Plan was feasible, and had no doubts that the Class 1 secured creditors would be paid in full. He explained at the confirmation hearing that although they had identified many small start-up companies and had engaged them in discussions, those companies had not integrated the technology into their business models, and Neu concluded that entering into licensing agreements with brand new entities would not be feasible because it would take too long to generate a sufficient revenue stream. ECF No. 104, audio file 38:50-39:13. Instead, Neu testified that the target audience would be well established companies that are engaged in e-commerce and utilization of Debtor's technology would engage consumers in a more effective manner. ECF No. 104, audio file 39:15-39:28.[3]

### B. Post Confirmation Events

The Marketing Term expired on November 26, 2017. Prior to expiration of the Marketing Term, Neu, acting as incorporator, caused Articles of Incorporation to be filed with the Montana Secretary of State for a new entity, Metadirect, Inc. ("Metadirect"). Ex. AM 3, 4. Neu requested 1 hour expedited filing, and the effective date of the articles was November 16, 2017. *Id.* On the effective date of the articles, Neu acting as a director of Metadirect, executed a

---

[3] The Court cannot reconcile Neu's testimony at the hearing on the Motion with Neu's testimony at the confirmation hearing. In making its findings of fact, the Court has relied upon its opportunity to observe the witness testify, assess his credibility, and assign the proper weight to be afforded to his testimony.

written consent, which among other things authorized the sale of stock in Metadirect, to each of the following for a purchase price of $10,000.00: Dan James; Clyde Neu; Gerald and Susan Woodahl; James and Catherine Neu; and Malcolm Long.  AM Ex. 6.  In exchange for $10,000, each purchaser received 20,000 shares.  *Id.*  Of the forgoing purchasers, Dan James and Neu were insiders of the Debtor (Ex. 11 at 11), while Gerald and Susan Woodahl and Catherine and James Neu were creditors of the Debtor (Ex. 11 at 20-21).  With the exception of Malcolm Long, Metadirect's shareholders were previously connected to Debtor in some manner, either as insiders, or creditors.

Having established Metadirect, Neu caused Metadirect and Debtor to enter into a License Agreement, ("Agreement").[4]  The Agreement set forth the terms of Debtor's licensing its property to Metadirect (the "Metadirect Transaction").  In connection with the Agreement, Metadirect agreed to pay Debtor: a one-time "license execution fee" of $5,000; $1,605 as Patent Cost Reimbursement; and, only after Metadirect "engages in commercial use or sale of the licensed property, but not before a minimum royalty of $5,000.  Ex. 1, ¶¶ 9.1, 9.2, 9.3.  So far, Debtor has been paid, $6,605.  None of this money has been distributed to creditors because, as Neu testified, only "net proceeds" could be distributed to creditors.  The Agreement pays 85% of any net proceeds to the shareholders and 15% to Debtor. Ex. 1, ¶ 9.4.

Prior to entering the Agreement, Neu received an offer from Milliken to acquire all of the Debtor's intellectual property for $96,000.  Ex. 18.  Neu did not respond to this offer, reasoning that as result of certain subordination agreements executed by certain creditors, $96,000 would only produce funds sufficient to pay claims he characterized as the "Senior Secured Claims", specifically the claims of Milliken, Nathan Johnson, Christopher Johnson, and Maxwell Porter.

---

[4] Ex. 1, the "Agreement" is unsigned.  According to its terms, its effective date was to be November 20, 2017.

5

Ex. 19.  Thus, Neu concluded that the transaction with Metadirect and paying no one was better than accepting Milliken's offer.

### C.  The Final Decree

Three 3 days after the Agreement's effective date, Debtor requested a Final Decree. Debtor represented that: the Order confirming the Plan has become final; any deposits required by the Plan have been distributed; any property proposed by the Plan to be transferred has been transferred; the Debtor or successor of the Debtor under the Plan has assumed the business or the management of the property dealt with by the Plan; and, the payments under the Plan have commenced.  ECF No. 122.  Consistent with Mont. LBR 9013-1(g)(2)(Y),[5] the Court entered a Final Decree on November 20, 2017.  On December 1, 2017, Milliken objected to entry of a final decree, requested reconsideration and filed the Motion.

### Discussion

Section 1112(b)(4)(N) provides that "cause" to convert or dismiss includes "material default by the debtor with respect to a confirmed plan."  11 U.S.C. § 1112(b)(4)(N).  One commentator has explained:

> Although similar to section 1112(b)(4)(M), section 1112(b)(4)(N) is somewhat broader in its application. A default with respect to a plan may occur at any time after confirmation, and at any time before or after substantial consummation. If the default is material, cause will exist under section 1112(b), and the court may convert or dismiss the case.

7 Collier on Bankruptcy ¶ 1112.04[6n] (16th ed. rev.).  "The movant bears the burden of establishing by preponderance of the evidence that cause exists." *Sullivan v. Harnisch* (*In re Sullivan*), 522 B.R. 604, 614 (9th Cir. BAP 2014).  Milliken argues that, "the default is Debtor's

---

[5] A Motion for Final Decree in a Chapter 11 case is a matter routinely granted or denied, without notice or hearing, in the Court's discretion, with any party in interest having the right to object, request a hearing and schedule a hearing to reconsider the issuance of any Order within fourteen (14) days of the date of the Order.  Mont. LBR 9013(g)(2)(Y).

invalid sham contract." Milliken Second Brief at 8. Debtor disagrees, contending that, "the License Agreement is bona fide, valid, enforceable, supported by adequate consideration, and entered into during the Marketing Term under the Confirmed Plan." Debtor Second Brief at 10. Debtor further argues that Milliken presented no evidence to the contrary at the February 8th hearing. *Id.* Thus, this Court must determine (i) whether the Metadirect Transaction is bona-fide, or a sham; (ii) if it is a sham, did Debtor materially defaulted on its Plan; and, (iii) if there was a material default, whether the case should be converted to Chapter 7, dismissed, or whether unusual circumstances exist in this case.

### A. The Metadirect Transaction, the Plan and § 1112(b)(4)(N).

"As courts of equity, bankruptcy courts will look through the form to the substance of any particular transaction and may contrive new remedies when those in law are inadequate...." *In re Global Western Development Corp.*, 759 F.2d 724, 727 (9th Cir.1985) (internal quotation omitted). Neu testified at length at the hearing, explaining that the transaction between Debtor and Metadirect complied with the terms of the Plan. According to Debtor, Neu's testimony established that it was, "unrefuted that the Metadirect License is the best available mechanism of maximizing the value of the intellectual property and of getting Mobiledirect's creditors paid, and that it serves the best interest of creditors which is management's charge under the Confirmed Plan." Debtor Second Brief at 7. The Court disagrees. Neu's testimony regarding the Plan's provisions and the Metadirect Transaction ignores the objectives of the Plan, the economic reality of the Metadirect Transaction, and his own testimony at the confirmation hearing.[6]

---

[6] The Court did not find Neu's testimony credible when considered with the record and realities of the case. As a result, the Court has given Neu's testimony little weight.

The Plan contemplated liquidation not reorganization. The Plan provided for, "payment of allowed claims from sale or liquidation of Debtor's assets, including its intellectual property." Ex. 12 § 7.01. Debtor was obligated to accomplish this goal within the Marketing Term, which was defined as "six months following entry of a final order of confirmation." Ex. 12 § 7.01.1. If Debtor failed to accomplish this goal within the Marketing Term, "any party may move to dismiss or convert the Debtor's Chapter 11 case." Ex. 12 § 7.01.2. The Metadirect Transaction, although completed within 6 months, failed to generate sufficient proceeds for payment of allowed claims. At its best, the Metadirect Transaction represents a questionable prospect of future performance that may generate a slight revenue stream, or sale of the technology in 60 months.[7]

The term of the Agreement and Debtors reliance on a variable income stream over time is not consistent with liquidation. The term of the Agreement is vaguely defined as:

> The term of this Agreement will commence on the Effective Date and will continue until the last of the Patent Rights expires (such expiration to occur only after expiration of extensions of any nature to such patents which may be obtained under applicable statutes or regulations, such as the Drug Price Competition and Patent Term Restoration Act of 1984 in the U.S.A., unless sooner terminated in accordance with the provisions set forth in this Article 12.0 (Term and Termination) of this Agreement.

Ex. 1 ¶ 12.1. Presumably throughout this period, Debtor will collect 15% of aggregated Net Sales Revenue. The utilization of these proceeds and timing of the payment of claims is unclear because the Plan did not contemplate funds trickling in over an indefinite period. Under the Plan, payment of claims was contingent on a "liquidation" that was to occur within 6 months, not a suspect revenue stream that seems more consistent with reorganization than liquidation. The

---

[7] Under the Agreement Debtor would be entitled to 15% of aggregated Net Sales Revenue. Net Sales Revenue is defined in the Agreement as the balance after deducting a list of other charges or expenses. Ex. 1, ¶¶ 9.3, 9.4. The remaining 85% is presumably retained by Metadirect, and available for distribution to its investors, many of whom were either investors or creditors of Debtor. Finally, Metadirect has a 60-month option to acquire the technology.

UST characterized the Agreement as, "in effect, a license to further license or sell the technology, which is what the Debtor was supposed to do within the Marketing Term." UST Brief at 7. The Agreement appears to the Court to be more consistent with a reorganization, not a liquidation.

Under the Agreement, Debtor would unilaterally extend the Marketing Term from 6 to 60 months. Debtor insists that this is permissible under the Plan, because according to the Plan:

> If Debtor enters into a license that generates revenue for the Debtor post-confirmation, then the Marketing Term, before or after entry of a Final Decree closing of the Debtor's Ch. 11 case, is deemed extended to correspond to the expiration of the term of any license, to the expiration of the term of any renewal of such license of its assets, and/or to a date necessary to close on any sale of the Debtor's assets granted under an option to purchase its assets granted in any license, or otherwise.

Debtor Second Brief at 9, ¶ d. Debtor's reliance on this provision strikes this Court as too clever-by-half, after scrutinizing the Agreement and circumstances related to the Metadirect Transaction.

The Metadirect Transaction has no measurable economic benefit for Debtor. The payments made by Metadirect to Debtor of $5,000 and $1,605 are at best, nominal consideration. According to Debtor's Ex. 19, the Plan contemplates total scheduled payments of $345,894. Thus, the amounts paid by Metadirect to Debtor amount to less than 1.9% of the actual amount needed to pay claims under the Plan. Even if an additional $5,000 is paid by Metadirect, bringing the total consideration to $11,605, Debtor has only realized 3.3% of the amounts necessary to pay claims. This analysis does not take into account accruing interest on those claims. While Debtor claims this qualifies as "generating revenue" under the Plan, it is wholly inadequate for fulfilling the Plan's purpose of paying claims. Although the Agreement gives Metadirect a 5-year option to acquire the technology for $400,000.00, which would result in

payment of all claims, the Court doubts this was intended to be anything more than window dressing in the Agreement.

The circumstances surrounding Metadirect's formation are the basis for the Court's doubts regarding the sale provision, and other terms of the Agreement.  The Marketing Term expired on November 26, 2017.  Metadirect was formed 10 days before the Marketing Term expired.  The unsigned Agreement between Debtor and Metadirect had an effective date of November 20, 2017, 6 days before the Marketing Term expired.  And, a final decree was requested on the same day as the effective date of the Agreement.  Further, Metadirect's shareholders include insiders of the Debtor and certain creditors of the Debtor.  These facts are indicia that Metadirect is little more than a strawman organized by Neu and others associated with Debtor to facilitate a transaction and prevent any party from moving to "dismiss or convert the Debtor's Chapter 11 case" at the close of the 6-month Marketing Term.  While Neu explained at the hearing that there were business reasons for the Metadirect Transaction, the Court finds the facts surrounding the transaction more compelling than Neu's explanation, and indicative of subterfuge.

Finally, Neu's justifications for the Metadirect Transaction cannot be reconciled with his testimony regarding feasibility at the confirmation hearing or the Disclosure Statement.  At the confirmation hearing, Neu explained that entering into licensing agreements with brand new entities had been considered, but these start ups would not be Debtor's target audience because it would take too long to generate a sufficient revenue stream from these small companies.  ECF No. 104, audio file 38:50-39:13.  Instead, Neu concluded that the target audience for purposes of the Plan would be well established companies that are engaged in e-commerce.  ECF No. 104, audio file 39:15-39:28.  Neu's testimony at the confirmation hearing was consistent with the

10

Disclosure Statement which described the prospective acquirer or licensee as large, successful, and established in e-commerce with established customers.  Ex. 11 at 25.

Metadirect is not large, successful, engaged in e-commerce, and has no established customers.  Metadirect is precisely the type of new start-up entity Neu testified would not be considered as a "target" because a new entity would take too long to generate a revenue stream.[8] In light of Neu's testimony at confirmation, that feasibility required a transaction with a well-established company, this Court cannot conclude that the Metadirect Transaction was anything more than an effort by Neu and Metadirect's shareholders to subvert the Plan when it was clear that the Marketing Term was about to expire without having entered into a prior agreement for the liquidation of Debtor's property.

Mobiledirect is not the first debtor to materially deviate from its confirmed plan post-confirmation.  See *Kenny G Enters., LLC v. Casey* (*In re Kenny G Enters., LLC*), 2014 WL 4100429, *12 (Mem. Dec.) (9th Cir. BAP Aug. 20, 2014).  In *Kenny G*, debtor's confirmed plan contemplated reorganization.  It was not a liquidating plan.  2014 WL 4100429, *1.  Despite this, post confirmation, debtor sold its single asset and filed a motion for a final decree.  Debtor contended it was entitled to a final decree and discharge under Rule 3022 because with the exception of one creditor, the property had been sold and all creditors had been paid pursuant to the plan.  *Id*. at *2.  The objections made by creditors and the UST, included, "no provision in the Plan provided for the sale of the Property."  *Id*. at *3.

At the hearing on the objection, the bankruptcy court stated:

---

[8]  Metadirect had been formed for two purposes: (1) continue prosecuting the existing patent application with two additional patents expected to issue, each adding more value to the Company's assets, and (2) launch a business in the security and surveillance vertical marketplace pursuant to its exclusive license with an option for the same in ecommerce.  Debtor Second Brief at 3 (ECF No. 158-1).

> The wrinkle in this case, of course, is that you have a confirmed plan. So you have a post-confirmation reorganized Debtor deciding, plan schman, I'm just going to go ahead and sell.

2014 WL 4100429, at *4. The bankruptcy court, entered an order denying debtor's request for a final decree, and converted the case to chapter 7. *Id*. at *5. On appeal, the BAP affirmed the bankruptcy court concluding, "thus, the sale of the Property contradicted the terms of the Plan, thwarted its essential purpose of reorganization and constituted a material default with respect to the confirmed Plan under § 1112(b)(4)(N)." *Id*. at *12.

Like the debtor in *Kenny G*, the Debtor in this case acted in a manner inconsistent with its confirmed Plan. Debtor's change in strategy is essentially a modification of Debtor's Plan, and a switch from liquidation to reorganization. Had Debtor wanted to modify the Plan, it could have done so by filing a motion under § 1127(b) which allows for modification after confirmation, subject to §§ 1122, 1123, 1129, notice and a hearing.[9] Like the bankruptcy court in *Kenny G*, this Court is troubled by Debtor's disregard for the Plan, § 1127(b) and the corresponding decision to frustrate the Plan by entering a transaction that bears no indicia of legitimacy and achieved nothing significant for Debtor, except an extension of time at the creditors' expense.

The circumstances surrounding the formation of Metadirect, the timing of the transaction between Debtor and Metadirect, the absence of any material economic benefit to Debtor from the Metadirect Transaction, and the Court's determination that Neu's testimony at the hearing could not be reconciled with the Disclosure Statement, or the Plan's formulation and confirmation, all weigh in favor of concluding the Metadirect Transaction was inconsistent with the Plan's overarching purpose, liquidation. Further, the Court cannot conclude that it was a bona-fide

---

[9] Further, § 1127(c) requires a proponent of a modification to comply with the disclosure requirements of § 1125 "with respect to the plan as modified" if the modifications are material. *In re Simplot*, 2007 WL 2479664, * 11 (Bankr. D. Idaho).

transaction.  At its best, the Metadirect Transaction deviated from the terms of the confirmed Plan and represents a material default.  At its worst, the Metadirect Transaction was a deliberate attempt by Debtor to avoid the consequences of the confirmed Plan, resulting in a "sham" agreement between 2 identities whose composition, management and names are remarkably similar and intertwined.  Ultimately, Debtor did not, for purposes of the Plan, enter into an agreement that generates revenue for the Debtor post-confirmation within the 6-month Marketing Term.  The Metadirect Transaction constitutes a material default with respect to the confirmed Plan under § 1112(b)(4)(N).[10]

### B.  Conversion or Dismissal of Debtor's case under 11 U.S.C. 1112(b)(4)(N).

After determining cause exists, the bankruptcy court must consider whether dismissal or conversion would best serve the interests of creditors. *Woods & Erickson, LLP v. Leonard* (*In re AVI, Inc.*), 389 B.R. 721, 729 (9th Cir. BAP 2008).  In deciding between dismissal and conversion under § 1112(b), this Court must consider the interests of all creditors.  *Hutton v. Treiger* (*In re Owens*), 552 F.3d 958, 960 (9th Cir. 2009).  Notably, Milliken and Debtor both argue against conversion.  The UST also concluded that conversion would not be in the best of interests of creditors, noting that the technology is complex, and a trustee would encounter the same if not greater difficulty in any effort to market the property, "making it unlikely a trustee would realize significant value."  UST Brief at 15.  The Court agrees.  Conversion in this case would accomplish little, leaving the Court to consider dismissal.

The Plan contemplates that if Debtor failed to enter into a qualifying transaction within 6 months, "any party may move to dismiss or convert the Debtor's Chapter 11 case."  Ex. 12 § 7.01.2.  As an alternative to dismissal, the UST has urged this Court to consider whether

---

[10] As a result of this finding and conclusion, the Court will vacate its Order at ECF No. 124, consistent with Mont. LBR 9013(g)(2)(Y).

13

"unusual circumstances" might exist under § 1112(b)(2).  *In re Sullivan*, 522 B.R. at 612 (citing § 1112(b)(1), (b)(2), and *Shulkin Hutton, Inc., P.S. v. Treiger (In re Owens)*, 552 F.3d 958, 961 (9th Cir. 2009)).  According to the UST, the "fact that the patent allowance came later in the Marketing Term than anticipated, coupled with the unavailable video demonstrations and the fact that most creditors will likely receive nothing in a conversion or dismissal, supports a finding of 'unusual circumstances.'"  Despite the UST's urging, this Court cannot conclude that "unusual circumstances" exist in this case.

The Debtor proposed the 6-month marketing Term.  If marketing the technology was dependent upon a "patent allowance" that would be forthcoming, Debtor should have considered that in connection with drafting the Plan, and provided for a longer marketing Term.  If Debtor needed additional marketing time beyond the 6 months permitted under the Plan, Debtor could have moved to modify the Plan under § 1127(b).  Instead of modifying the Plan, Neu and others associated with Debtor formed Metadirect for purposes of establishing that Debtor had entered into a transaction within 6 months, seemingly to avoid conversion or dismissal.  Based on the record before the Court, there is nothing unusual about a debtor's failed attempt to market technology that has only completed part of the patent process and is unproven in the marketplace.

Having considered conversion, dismissal and whether unusual circumstances permeate the case, this Court has determined that dismissal is the corresponding outcome that must accompany its finding that a material default under the Plan occurred.  Although the Court is cognizant that dismissal does not benefit any of the creditors, perhaps with the exception of Milliken, the Court notes that dismissal is wholly consistent with the Plan.  Creditors cannot complain that dismissal is at odds with their expectations because the Plan specifically allowed

14

for dismissal as a remedy, should Debtor fail to liquidate the property within the Marketing Term.

<u>**Conclusion**</u>

Should a debtor encounter circumstances which require it to modify its plan post confirmation under § 1127(b), a debtor must do so.  This Court cannot conceive of circumstances under which a debtor's unilateral decision to deviate from a confirmed plan and switch from a liquidation to a reorganization, or vice versa, without court approval under § 1127(b) would not constitute a material default under § 1112(b)(4)(N).  For the reasons discussed above, the Court will enter a separate order providing as follows:

**IT IS ORDERED** Milliken's Objection to Entry of Final Decree field on December 1, 2017 (ECF No. 128) is **GRANTED;** and the Final Decree entered in this case on November 20, 2017, is **VACATED.**

**IT IS FURTHER ORDERED** Debtor's objection filed at ECF No. 133 is overruled and Milliken's Motion to Dismiss filed on December 1, 2017 (ECF No. 127) is **GRANTED;** and the above-captioned Chapter 11 bankruptcy case hereby is **DISMISSED**.

BY THE COURT:

Hon. Benjamin P. Hursh
United States Bankruptcy Court
District of Montana